# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CHRISTOPHER CRUZ,**
**DONOVAN MAEZ,**

      **Plaintiffs,**

**vs.**                                                                 **No. CIV 17-676 JAP/SCY**

**CITY OF ALBUQUERQUE,**
**a New Mexico municipality, and**
**JODI GONTERMAN,**
**In her individual capacity,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On August 14, 2017, Plaintiffs Christopher Cruz and Donovan Maez filed an amended complaint against Defendants City of Albuquerque and Albuquerque Police Department Detective Jodi Gonterman, in her individual capacity, under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, NMSA 1978 § 41-4-12.[1] Plaintiffs brought claims for illegal and false arrest, false imprisonment, malicious prosecution, abuse of process, and deprivation of state and federal constitutional rights arising from events in the aftermath of Jaydon Chavez-Silver's murder in June 2015. *See* Amended Complaint (Doc. 16). Defendants filed a motion seeking summary judgment on all of Plaintiffs' claims on the grounds that they are entitled to qualified immunity on the federal

---

[1] *See* FIRST AMENDED COMPLAINT FOR CIVIL RIGHTS AND TORT VIOLATIONS PURSUANT TO 42 U.S.C. § 1983 AND THE NEW MEXICO TORT CLAIMS ACT (Amended Complaint) (Doc. 16). Plaintiff Cruz initially filed his Complaint for Civil Rights Violations Pursuant to 42 U.S.C. § 1983 and the New Mexico Tort Claims Act (Doc. 1-1) against Defendants in New Mexico State Court. Defendants removed the case to the United States District Court for the District of New Mexico on June 26, 2017 (Doc. 1). On August 14, 2017, Plaintiffs filed their Amended Complaint (Doc. 16) adding Plaintiff Donovan Maez to the suit.

claims and that immunity has not been waived under the New Mexico Tort Claims Act.[2] The

Motion is fully briefed.[3] On December 17, 2018, the Court heard oral argument on the Motion.

After considering the parties' arguments, briefs, evidence, and applicable authorities, the Court

will grant Defendants' Motion for Summary Judgment on Plaintiffs' Counts I and II, and will

remand Count III, the state law claims, and the case to the Second Judicial District Court, County

of Bernalillo, State of New Mexico.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc.*

477 U.S. 242, 247-48 (1986) (emphasis in original).  Rather, "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id.* at 248. The movant bears the initial burden of "show[ing] 'that there is an absence

of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.,*

939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).

Once the movant meets this burden, the nonmoving party must "go beyond the pleadings and by

[its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324

(quoting Fed. R. Civ. P. 56 (e)).

---

[2] *See* DEFENDANTS' OPPOSED MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF
PLAINTIFFS' COMPLAINT ON QUALIFIED IMMUNITY AND OTHER GROUNDS, AND MEMORANDUM
IN SUPPORT (Doc. 29) (Motion).
[3] *See* PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 41) (Response); DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSED
MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF PLAINTIFFS' COMPLAINT ON
QUALIFIED IMMUNITY AND OTHER GROUNDS (Doc. 47) (Reply).

However, when a defendant moves for summary judgment on the basis of a qualified immunity defense, the analysis is modified slightly. "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials…from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (ellipsis in original) (internal quotation marks and citation omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna,* __ U.S.__ , 136 S.Ct. 305, 308 (2015) (internal quotation marks and citation omitted). "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability[.]" *Pearson v. Callahan,* 555 U.S. 223, 237 (2009) (internal quotation marks and citation omitted).

Once the moving party asserts qualified immunity, the nonmoving party has the "the burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal quotation marks and citation omitted). If the nonmoving party fails to establish either part of the two-part inquiry, the court must grant the moving party qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  If the nonmoving party satisfies both elements of the qualified immunity analysis, then the moving party assumes the normal summary judgment burden of demonstrating that no material facts, that would defeat its claim for qualified immunity, remain in dispute. *Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992). In analyzing a motion for summary judgment, the Court "view[s] the facts and evidence submitted by the parties in the light most favorable to the nonmoving party." *Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1225 (10th Cir. 2016).

# BACKGROUND

The facts of this case, viewed in the light most favorable to the Plaintiffs, are as follows.[4]

## A. Investigation and Arrest of Plaintiffs

At around 10:00 p.m. on June 26, 2015, Manzano High School student Jaydon Chavez-Silver was shot through a window while attending a gathering at 1101 Nakomis Drive NE in Albuquerque, New Mexico. *See* Mot. UMF #1; Resp. at 11. A neighborhood witness reported that around 10:05 p.m. he heard seven or eight pops that he thought were firecrackers, and then he saw an "older model large car" that he stated reminded him of a "Nissan Maxima" that "looked 'pearlesque' or white in color" speeding by. *See* Def. Ex. J, Interview w/ Todd Busby at 3:5-10, 3:18-20, 4:2-13 (Doc. 29-11). When officers arrived at the Nakomis house, Jaydon was lying prone on the kitchen floor. *See* Mot. UMF #2, Resp. at 11. He was transported to the hospital where he later died as a result of the gunshot wound. *See* Mot. UMF #2, Resp. at 11. Albuquerque Police Department Detective Jodi Gonterman was assigned to investigate the murder. *See* Mot. UMF #4, Resp. at 11.

As part of the investigation, Detective Gonterman and other officers conducted a series of interviews with witnesses who were present at the Nakomis residence at the time of the shooting. Detectives learned from more than one witness that there had been a fight at the Nakomis residence during a gathering that took place approximately one month prior to the shooting. *See* Mot. UMF #12; Resp. at 11-12; Def. Ex. I, Interview w/ Isaiah Curley, 06/27/15 at 19:1-4 (Doc. 29-10); Mot. UMF #7, Resp. at 11. At that gathering, an individual named Marcus Purdue beat up another male guest. *See* Mot. UMF #7, Resp. at 11. One witness stated that a male individual known as "Runner"

---

[4] Many of the individuals referenced in this case, including Plaintiffs, are known to one another only through their Facebook user or tag names. To avoid confusion and maintain a clean record, the Court will refer to individuals by their given names where known.

pulled a gun out during the altercation, and that "these people said that they're going to drive by on us…" *See* Mot. UMF #7, Resp. at 11; Def. Ex. E, Interview with Matthew Day at 35:1-12, 36:1-3 (Doc. 29-6). Another witness confirmed that "Runner" was at the Nakomis house the night of the fight and that a gun was pulled. *See* UMF #11; Resp. at 11; Def. Ex. I, Interview w/ Isaiah Curley, 06/27/15 at 19:1-7, 19-20 (Doc. 29-10). Marcus Purdue, who resided at 1101 Nakomis, confirmed with detectives that he had been in a fight at the house a month ago with someone he guessed was named "Runner." *See* Mot. UMF # 8, Resp. at 11; Def. Ex. F, Interview with Marcus Purdue at 4:15-23; 5:17-25 (Doc. 29-7). And on June 28, 2015, Detective Gonterman received a tip that Marcus Purdue was the target of the shooting. *See* Mot. UMF #14; Resp. at 12; Def. Ex. K, Recorded Call w/ James King at 3:14-17 (Doc. 29-12).

Bernie Miller was also living at 1101 Nakomis Drive NE and was at the house when Jaydon was killed. Miller told detectives that he thought "David Zamora, Donovan Maez, Chris Marley [a.k.a. Christopher Cruz], all of those kids" were involved in the shooting because there had previously been a brawl at the house and one of their friends was beaten badly – possibly by Marcus. *See* Mot. UMF #15; Resp. at 12; Def. Ex. L, Interview w/ Bernie Miller at 14:23-15:17 (Doc. 29-13).

Defendant Gonterman also received three additional tips that she later included in her affidavit. *See* Def. Ex. C, Maez Criminal Complaint (Doc. 29-4); Def. Ex. B, Cruz Arrest Warrant (Doc. 29-2). One of those tips came from Mariah Madrid who alerted Defendant Gonterman to a Facebook post. Ms. Madrid indicated that she did not personally know Chris Cruz and Donovan Maez, but she had been watching their Facebook accounts because they had allegedly been robbing her friends. Consequently, she noticed a Facebook post after the shooting. *See* Pl. Ex. 28, Gonterman Depo. at 33:3-17; 34:19-20 (41-16); Pl. Ex. 46, Suppl. Rpt. Mariah Madrid Interview

(Doc. 41-33). Defendant Gonterman reviewed Facebook posts by David Zamora (a.k.a. Runner) and Christopher Cruz. *See* Mot. UMF #16, Resp. at 13. On June 26, 2015, David Zamora posted "Who needs the addy" to which there were responses asking if it was the Chelwood or Western Skies party. *See* Def. Ex. C, Maez Criminal Complaint (Doc. 29-4); Def. Ex. B, Cruz Arrest Warrant (Doc. 29-2). At 9:35 p.m. also on June 26, 2015, Christopher Cruz posted a picture that displayed a person's lap holding ten rounds of ammunition with the statement "Cooling in my section." *Id.* A few hours later at 2:17 a.m., now on June 27, 2015, Cruz posted "Smoking This Fat Ass Joint Tryna Finish bottle of Ciroc Cuzz Nobody Likes a Quitter Lol Kinda Worried About the Brothers tho Hmi Asap #Raw Papers # Fuck the Feds." *Id.* This post was followed by several responses from other individuals. Defendant Gonterman included portions of these Facebook posts in her warrant affidavit for Plaintiff Cruz and her criminal complaint for Plaintiff Maez. *See* Def. Ex. C, Maez Criminal Complaint (Doc. 29-4); Def. Ex. B, Cruz Arrest Warrant (Doc. 29-2); Mot. UMF #17. She noted that "[t]he social media messages are consistent with the timeframe of the shooting, people involved and associates and indicate to me based on my training and experience that they are discreetly talking about the shooting and no one giving anyone up."[5]*Id.*

There were several other individuals involved with the Facebook posts. On June 29, 2015, Defendant Gonterman interviewed William Pagan, one of the individuals who had commented on the posts. *See* Resp. at 14; Pl. Ex. 8, Suppl. Rpt. William Pagan (Doc. 41-5). Pagan told Defendant Gonterman that he didn't know what the posts were talking about and then added, "They're probably talking about getting into some type of trouble, but they're not shooting nobody[.] *Id;* Pl. Ex. 28, Gonterman Depo, 64:10-20 (Doc. 41-16). The following day Defendant Gonterman

---

[5] Plaintiffs dispute that Defendant Gonterman's interpretation of the Facebook posts was based on training, experience, or proper investigative methods, but rather suggest Defendant Gonterman's interpretation was based on speculation alone. *See* Resp. ¶ 17.

interviewed Devin Griego who also had responded to the Facebook posts. *See* Pl. Ex. 7, Suppl. Rpt. Devin Griego (Doc. 41-4). Referencing the chain of Facebook posts beginning with Plaintiff Cruz's post, Defendant Gonterman told Griego that she understood the post to indicate that everyone was talking about the "shooting at Jaydon's, retaliation from the fight." *Id.* Griego responded, "That's a whole different thing probably, like honestly. I mean, you can try to say it's related to that but it's not." *Id.* Defendant Gonterman did not interview Allen Moya who had also commented on the Facebook posts. *See* Pl. Exhibit 28, Gonterman Depo. at 68:21-69:1 (Doc. 41-16).

The second "tipster" Defendant Gonterman referred to in her affidavit was Nicholas Glenn, Donovan Maez's friend. On August 11, 2015, Defendant Gonterman interviewed Glenn. *See* Def. Ex. M, Transcript of Glenn Interview (Doc. 29-14); Def. Ex. M-1, Audio Recording of Glenn Interview. Glenn reported to Defendant Gonterman that he overheard a conversation that Donovan Maez had with another individual about the Jaydon Chavez-Silver case. *See* Pl. Ex. 28, Gonterman Depo. at 79:13-21; Def. Ex. M-1, Audio Recording of Glenn Interview. Glenn told Defendant Gonterman that Glenn was at the 1101 Nakomis Drive residence when the shooting occurred. *See* Mot. UMF ¶ 20, Resp. ¶ 20, Def. Ex. M, Transcript of Glenn Interview at 6:5-8 (Doc. 29-14). Defendant Gonterman asked Glenn if he knew the identity of the shooter, who was there, and what type of car the shooter was in. *See* Def. Exhibit M, Transcript of Glenn Interview at 8:11-8:13 (Doc. 29-14). Glenn responded "I don't know cars. I don't know shooters. I know – I know Donovan, Donovan Maez, Maez, whatever…Fucking kid. He was involved somehow. I don't know." *See id.* at 8:14-19. Glenn proceeded to explain that he had gone to his friend Armand's house, walked in on Armand and Donovan talking, and overheard Donovan "saying he was freaking out because they'd 'shotten' at a house." *Id.* at 8:19-9:1. Glenn stated that he asked

Armand about the conversation. According to Glenn, Armand responded that Donovan knows who did it. *Id.* at 9:2-5. Glenn continued, "But I'm not sure if that's implying Donovan did it, because I heard Donovan say he was in the car." *Id.* at 9:6-8.[6] Later in the conversation Glenn reiterated, "He just said he was in the car…I'm not sure if that's implying he was in the car at the shot, because I never—I didn't talk to him about it…I just heard him say that he was in the car and shit started going down and that they were trying to hit Curley." *Id.* at 23:11-21. When asked if Donovan said anything about his bullet being the one that killed Jaydon, Glenn answered: "I don't know. He's –I'm pretty – he's freaked – that's what he was freaking out about, is that he was scared that his bullet's the one that hit Jaydon[.]" *See* Mot. UMF #23; Response at 20; Def. Exhibit M, Transcript of Glenn Interview at 26:21-27:2 (Doc. 29-14). Defendant Gonterman never interviewed Armand. Resp. ¶ 22; Reply at 6-7. Defendant Gonterman included information from her interview with Glenn in the criminal complaints for both Plaintiffs, referring to Glenn as Concerned Citizen #1 or "CC." *See* Def. Ex. C, Maez Criminal Complaint (Doc. 29-4); Def. Ex. B, Cruz Arrest Warrant (Doc. 29-2); Mot. UMF #24.

On August 14, 2015, Defendant Gonterman interviewed Drew Dugger, another of Donovan Maez's friends, at the Albuquerque Police Department. *See* Mot. UMF #25, 28; Resp. ¶¶ 25, 28; Def. Ex. N, Dugger Interview Transcript (Doc. 29-15); Pl. Ex. 4, Dugger Interview Transcript (Doc. 41-3). At the time of his interview, Dugger was in custody on an unrelated arrest warrant. *See* Mot. UMF #29; Resp. ¶ 29. After receiving *Miranda* warnings, Dugger initially

---

[6] The parties dispute the characterization of Glenn's response to Defendant Gonterman's questions about the shooter's identity and the car. In UMF #21, Defendants indicate that Glenn responded that he did not know the shooters, but that he knew Donovan Maez was involved somehow because he overheard a conversation between Donovan Maez and Glenn's friend during which Glenn claims he heard Donovan state that "he was in the car and shit started going down and that they were trying to hit Curley." *See* Mot. UMF # 21. The transcript reflects that Glenn did say this, but the quote is taken from a portion of the transcript 14 pages after Gonterman's question about the identity of the shooter. Plaintiffs cite the portions of the transcript immediately following Defendant Gonterman's questions, which are reflected above, to suggest that Glenn did not know or understand whether Donovan was in the car at the time of the shooting. *See also* Resp. at 17-18.

denied knowing anything about Jaydon Chavez-Silver's shooting and Plaintiffs' alleged involvement with the incident. *See* Mot. UMF #33; Resp. ¶ 33; Pl. Ex. 4, Dugger Interview Transcript at 13:17-20 (Doc.41-3); Pl. Ex. 28, Gonterman Depo, at 200:24-201:2 (41-16). At one point during the interview Defendant Gonterman said to Dugger, "Look at me. I'm not messing around today. I'm not going to let you lie to me. I'm not going to have it. Because I will just…you know, we'll end this and you can go to jail." *See* Mot. UMF #31, Resp. ¶ 31; Def. Ex. N, Dugger Interview Transcript at 27:24-28:3 (Doc. 29-15).

Sometime after Defendant Gonterman's statement, Dugger recounted that Maez told him that Maez was driving around on the night of Jaydon Chavez-Silver's death with Cruz testing out the new TEC-9 or .40 Glock. *See* Mot. UMF # 36, Resp. ¶ 36. Dugger stated, "They told me – they told me they were – they were just shooting, and Jaydon got hit. They weren't – they weren't trying to hit him. They weren't trying to shoot him." *See* Mot. UMF #37, Resp. ¶ 37, Def. Ex. N, Dugger Interview Transcript at 61:25-62:3 (Doc. 29-15). Dugger also claimed that Cruz called someone at the Nakomis party and then "slid on him."[7] *See* Mot. UMF #39, Resp. ¶ 39; Def. Ex. N, Dugger Interview Transcript at 66:23-67:10. When questioned about motive, Dugger first offered, "I – they – from what they told me, they were just driving down the street shooting, just shooting the new gun. There wasn't really no motive, or anything." *See* Resp. ¶ 33; Pl. Ex. 4, Dugger Interview Transcript at 33:112-16 (Doc. 41-3). Much later in the interview when pressed again about motive, Dugger revealed that he thought Bernie Miller or another individual owed Cruz money. *See* Mot. UMF #34, Resp. ¶ 34, Def. Ex. N, 133:12-20 (Doc. 41-3). As the result of a search warrant, Defendant Gonterman discovered a text message on Bernie Miller's phone indicating that he owed someone money, but that person was not identified in the text message. *See* Mot. UMF #35, Resp.

---

[7] Dugger explained that this was "slang for like drove—drove up on him." Def. Ex. N, Dugger Interview Transcript at 67:5-9 (Doc. 29-15).

¶ 35, Def. Ex. P – Cell Phone Extraction Report (Doc. 29-17). Dugger told Defendant Gonterman that Cruz had a light tan Nissan, and Dugger later accompanied Albuquerque Police Department Detective David Nix to the apartment complex where Cruz was staying. At that location Detective Nix observed in the parking lot a light tan Nissan Maxima registered to Christopher Cruz's brother Anthony. *See* Mot. UMF #41, 42; Resp. ¶¶ 41-42; Def. Ex. N., Dugger Interview Transcript, 75:10-76:22 (Doc. 29-15); Def. Ex. Z, Affidavit of Jodi Gonterman (Doc. 29-26). Defendant Gonterman included information from her interview with Dugger in the criminal complaints as to both Plaintiffs, referring to Dugger as Concerned Citizen (CC) #2. *See* Def. Ex. B, Cruz Arrest Warrant (Doc. 29-2); Def. Ex. C, Maez Criminal Complaint (Doc. 29-4); Mot. UMF #43; Resp. ¶ 43.

On August 14, 2015, Defendant Gonterman interviewed Plaintiff Donovan Maez at the Albuquerque Police Department. Maez was in police custody on an outstanding warrant for auto burglary. *See* Mot. UMF #44, Resp. ¶ 44; Def. Ex. R, Warrant for Arrest (Doc. 29-19). Plaintiff Maez told Defendant Gonterman that around 10:00 or 10:30 p.m. on the night of Jaydon's shooting, he, Cruz, and ten others were "pregaming" at their friend's house. *See* Mot. UMF #45-46; Resp. ¶¶ 45-46; Def. Ex. Q, Donovan Maez Interview Transcript at 14:1-4, 19:16-23 (Doc. 29-18). At the end of the interview, Defendant Gonterman stepped out of the interview room and later returned to tell Maez that she spoke with the District Attorney and had enough to book him for Jaydon's murder. *See* Def. Ex. Q, Maez Interview Transcript at 39:17-25 (Doc. 29-18). Defendant Gonterman drafted a criminal complaint for Maez's arrest charging him with an open count of murder, among other criminal offenses. *See* Mot. UMF # 49; Resp. ¶ 49. Maez was arrested on the outstanding auto burglary warrant and then charged with Jaydon's murder in accordance with the criminal complaint. *See* Mot. UMF #55, Resp. ¶ 54.

Defendant Gonterman also drafted an affidavit requesting an arrest warrant for Christopher

Cruz. *See* Mot. UMF # 51, Resp. ¶ 51. Assistant District Attorney Sarah Coffey first reviewed the warrant affidavit. Coffey initially determined that there was insufficient evidence to support probable cause. *See* Pl. Ex. 30, Depo. of Sarah Coffey at 36:2-9 (Doc. 41-18). However, ADA Coffey approved the warrant affidavit when Detective Gonterman disclosed that witnesses had seen a "white car of some kind" and that "one of the individuals owned a similar white car to the witness statement…that tipped it in favor of having probable cause." *See* Pl. Ex. 30, Depo of Sarah Coffey at 36:14-24. Judge Linda Rogers then also reviewed the warrant application and approved the issuance of an arrest warrant for Christopher Cruz. *See* Mot. UMF #52-53, Resp. ¶¶ 52-53. On August 17, 2015, Christopher Cruz turned himself in on the arrest warrant. *See* Mot. UMF #55, Resp. ¶ 55.

### B. Post-Arrest Proceedings

On August 19, 2015, Defendant Gonterman conducted a brief telephone interview with Plaintiffs' friend David Garcia. *See* Resp. AMF # EE, FF; Pl. Ex. 22, Garcia Suppl. (Doc. 41-14). Garcia corroborated Maez's claim that he and Cruz were with Garcia at the time of Jaydon's murder, that the group first "pregamed" at Garcia's house, and then went to a party on Western Skies. *See* Resp. AMF #GG; Pl. Ex. 22, Garcia Suppl. (Doc. 41-14). Garcia stated that he was with Cruz and Maez until around 1:00 a.m. when shots were fired into the air at the Western Skies location. *Id.* Garcia also informed Defendant Gonterman that Cruz was driving a red car that night. *See* Resp. AMF # HH, Pl. Ex. 22, Garcia Suppl. (Doc. 41-14). Defendant Gonterman believed Garcia was lying. *See* Resp. AMF #OO, Pl. Ex. 28, Gonterman Depo at 212:7-8 (Doc. 41-6).

On August 20, 2015, Defendant Gonterman again interviewed Nicholas Glenn, Concerned Citizen #1, after he reached out to Defendant Gonterman indicating that he wanted to speak with her. *See* Pl. Ex. 15, 08/20/15 Glenn Interview Transcript at 1:20-23 (Doc. 41-7); Resp. ¶ 20; Reply at 6. Glenn admitted that he had lied during the first interview and said that he never made it to the Nakomis house party on the night Jaydon was shot. *See* Resp. ¶ 20; Reply at 6; Pl. Ex. 15, 08/20/15 Glenn Interview Transcript at 3:7-10 (Doc. 41-7). Glenn stated that he was at a friend's house "partying" and they were about to leave when they heard about what had happened to Jaydon. *See* Pl. Ex. 15, 08/20/15 Glenn Interview Transcript at 3:10-23. Glenn reported that it was the day after the incident that he went to Armand's house and heard Maez say that he was freaking out. *See id.* at 3:25-4:1. Glenn reiterated what he had disclosed during the first interview with Defendant Gonterman, that he had walked into his friend Armand's house and had overheard a conversation Maez was having with Armand. *See id.* at 14:2-9. Glenn stated, "I just heard Donovan like freaking out, saying that he didn't know what hit what, and that he was just freaking about it." *See id.* at 8-13. When Glenn asked Maez what he was talking about, Maez confirmed he was talking about the "drive-by."[8] *See id.*

On August 21, 2015, four days after Plaintiff Cruz was arrested, his mother Yolanda Gutierrez called Defendant Gonterman regarding the Nissan. *See* Resp. ¶¶ 41, Pl. Ex. 21, Gutierrez Supp. (Doc. 41-13). Ms. Gutierrez informed Defendant Gonterman that the car Detective Nix had observed in the apartment complex parking lot was registered to an Anthony *Garcia*, not Cruz's brother Anthony Cruz. *Id.* Ms. Gutierrez informed Defendant Gonterman that her older son Anthony lived with his girlfriend and the white Nissan belonged to the girlfriend and had not run in months - a fact the neighbors could confirm. *See* Resp. ¶ 41; Pl. Ex. 21, Gutierrez Suppl.

---

[8] Seven months later, Drew Dugger, Concerned Citizen #2, also changed his initial statement to Defendant Gonterman during a March 2016 pretrial interview. *See* Amended Complaint ¶¶ 144-45.

On August 27, 2015, Defendant Gonterman testified before a grand jury. *See* Pl. Ex. 32, Grand Jury Transcript (Doc. 41-20). She indicated that she took Donovan Maez into custody because she had information at the time from a "credible, reliable source who had given other specific details in the case." *See* Pl. Ex. 32, Grand Jury Transcript at 32:23-33:2 (Doc. 41-20). The grand jury returned indictments charging Donovan Maez, Christopher Cruz, and Nicholas Gonzales. *See id.* at 65:1-23. Prior to Plaintiffs' arrest, Defendant Gonterman had received a tip that Nicholas Gonzales was the shooter. *See* Resp. AMF # G; Pl. Ex. 35, CC#4 Suppl. (Doc. 41-23). Defendant Gonterman further learned that Gonzales had removed his GPS ankle monitor at 3:00 p.m. on the day Jaydon was killed. *See* Resp. AMF # J; Pl. Ex. 28, Gonterman Depo. at 171:13-24 (Doc. 41-16). Defendant Gonterman also had information that Gonzales was arrested sixteen days after Jaydon's murder while driving his mother's bronze Nissan Maxima, at which time he was in the unlawful possession of a firearm. *See* Resp. AMF #I; Pl. Ex. 16, Rio Rancho Police Report (Doc. 41-8); Pl. Ex. 28, Gonterman Depo. at 172:17-173:11 (Doc. 41-16).

On June 2, 2016, the District Attorney's office dismissed the charges against Plaintiffs Maez and Cruz related to Jaydon Chavez-Silver's murder. *See* Mot. ¶¶ 56-57; Resp. ¶¶ 56; Def. Ex. U, Cruz Nolle Prosequi (Doc. 29-22); Def. Ex. V, Maez Nolle Prosequi (Doc. 29-23). Nicholas Gonzales ultimately pleaded guilty to shooting at an occupied dwelling resulting in great bodily harm and conspiracy to commit shooting at a dwelling. *See* Pl. Ex. 41, Gonzales Judgment & Sentence (Doc. 41-29).

Plaintiffs filed a complaint under 42 U.S.C. § 1983 alleging violations of their Fourth and Fourteenth Amendment rights and several intentional torts under the New Mexico Tort Claims Act, NMSA 1978, § 41-4-12. *See* Amended Complaint at 1 (Doc. 16). Count I alleges that Defendant Gonterman seized, arrested, and detained both Plaintiffs absent probable cause to

believe each had committed a crime. *Id.* at ¶¶ 319-328. Count II alleges that Defendant Gonterman committed malicious prosecution by manufacturing evidence which she knew was false or for which she was deliberately indifferent to the truth and by making material omissions leading to Plaintiffs' prosecutions absent probable cause. *Id.* at ¶¶ 329-344. Count III alleges state law tort claims against both Defendant Gonterman and Defendant City of Albuquerque. *Id.* at ¶¶ 345-351. In Defendants' Motion they rely on qualified immunity as an affirmative defense against Counts I and II and assert that immunity is not waived under the New Mexico Tort Claims Act as to Count III.

## **DISCUSSION**

Because Defendants have asserted qualified immunity as to Plaintiffs' federal claims, the burden shifts to Plaintiffs to (1) assert facts that, if true, would constitute a violation of their constitutional rights, and (2) demonstrate that the right violated was clearly established at the time such that Defendants would have known their conduct violated Plaintiffs' rights. *See Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017). "When determining whether qualified immunity applies, [the Court] may choose which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* (internal quotation marks and citation omitted).

I.     **Defendants' Motion for Summary Judgment on Plaintiffs' Section 1983 Claim for Illegal Seizure and Arrest (Count I)**

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen…or any other person…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Both Plaintiffs claim that Defendant

Gonterman violated their Fourth Amendment rights by seizing, arresting, and detaining them for the murder of Jaydon Chavez-Silver without probable cause. *See* Amended Complaint at 36-39 (Doc. 16).

In a qualified immunity context, the probable cause evaluation is a question of law for the Court to resolve. *See Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991) (overturning a circuit court decision that left probable cause to the trier of fact in an immunity context and reaffirming that immunity ordinarily should be decided by the court long before trial because qualified immunity is an entitlement to immunity from suit rather than a defense to liability). "[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at that time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 114 (10th Cir. 1994). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996).

Generally, a neutral magistrate judge's issuance of a warrant "is the clearest indication that the officers acted in an objectively reasonable manner or…in objective good faith." *Messerschmidt v. Millender*, __ U.S. __ , 132 S.Ct. 1235, 1245 (2012) (internal quotation marks and citation omitted). However, a court will not grant qualified immunity "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotation marks omitted). Moreover, a warrant will not protect an officer who "knowingly…, or with reckless disregard for the truth" includes false statements in the affidavit, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), or who "knowingly or recklessly omit[s] from an arrest affidavit information which, if included, would have vitiated

probable cause," *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990). "The burden is on the plaintiff to make a substantial showing of deliberate falsehood and reckless disregard for the truth by the officer seeking the warrant." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). The test is objective, allowing the Court to determine, as a matter of law, whether a reasonable officer could have found probable cause where there is no dispute over material facts. *See id.* The Court will address the arrests of each Plaintiff separately.

### A. Probable Cause to Arrest Donovan Maez

The Court begins by asking whether Defendant Gonterman had probable cause to arrest Donovan Maez. The parties do not dispute that Defendant Gonterman had knowledge of and arrested Plaintiff Maez on an outstanding warrant for auto burglary in violation of NMSA 1978, § 30-16-3B and that he was afterwards charged with Jaydon Chavez-Silver's murder. Nor have Plaintiffs challenged the probable cause underlying that outstanding auto burglary warrant. Auto burglary under New Mexico statute is a fourth-degree felony with a potential penalty of eighteen months of imprisonment. *See* NMSA 1978, § 31-18-15 (A)(13). On May 24, 2017, Maez pleaded no contest to the charge and received a suspended sentence of eighteen months with 244 days of presentence confinement credit for the time he was incarcerated. *See* Def. Ex. X, Plea and Disposition Agreement; Def. Ex. Y, Maez State Court Judgment. Defendants argue that because Detective Gonterman had, from an objective standpoint, independent probable cause to arrest Plaintiff Maez on the outstanding warrant for auto burglary, his Section 1983 claim for illegal seizure and arrest (Count I) and his claim of malicious prosecution (Count II) must fail. Plaintiffs counter that while Plaintiff Maez was initially arrested on a valid warrant, he was held continuously

without legal process on the murder charge for which there was no probable cause.[9]

The Court will address the malicious prosecution claim below, but finds, as a matter of law, that Defendant Gonterman had probable cause to seize, arrest, and detain Plaintiff Maez on the outstanding warrant even though the auto burglary charge was unrelated to the later murder charge. In *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004), the United States Supreme Court clarified that an arrest is lawful under the Fourth Amendment so long as probable cause existed as to any offense that could be charged. "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153 (citations omitted); *see also Apodaca v. City of Albuquerque,* 443 F.3d 1286, 1289 (10th Cir. 2006) ("All that matters is whether [the law enforcement official] possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground." (emphasis original)); *Kilgore v. City of Stroud,* 158 F. App'x 944 (10th Cir. 2005) ("Probable cause need only exist as to any offense that could be charged under the circumstances." (internal quotation marks and citation omitted)). Because Plaintiffs have not met their burden to establish that probable cause did not exist to arrest Plaintiff Maez, the Court does not reach the clearly established law prong of the qualified immunity analysis. The Court will grant summary judgment in Defendants' favor as to Plaintiff Maez's claim of illegal seizure and arrest in Count I of the

---

[9] Defendants invoke *Heck v. Humphrey,* 512 U.S. 477 (1994) to suggest that because Plaintiff Maez pleaded no contest to and was convicted for the auto burglary offense he cannot challenge the constitutional validity of his arrest. In *Heck*, the United States Supreme Court held that, if a judgment in favor of a plaintiff in a civil suit under 42 U.S.C. § 1983 would necessarily imply the invalidity of a prior criminal conviction, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. *See Heck,* 512 U.S. at 484-87. Plaintiffs argue that *Heck* does not apply here because Plaintiff Maez is not challenging the arrest for auto burglary. Instead, Plaintiff Maez alleges that, though arrested initially on a valid warrant for auto burglary, he was held for longer than he otherwise would have been without legal process for the murder charge which Plaintiffs allege was without probable cause. *Heck* has no bearing on the determination about whether Defendant Gonterman had probable cause to initially seize and arrest Plaintiff Maez, a question resolved by *Devenpeck* as discussed above.

Amended Complaint.

## B. Arrest of Plaintiff Christopher Cruz

To overcome the validity of an arrest warrant, Plaintiff Cruz must prevent evidence either that Defendant Gonterman knew that the information in the arrest warrant affidavit was false or that she "in fact entertained serious doubts as to the truth of [her] allegations" but still sought the warrant in reckless disregard for the truth. *Beard v. City of Northglenn,* 24 F.3d 110, 114, 116 (10th Cir. 1994). Reckless disregard for the truth may be inferred "from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* Plaintiff Cruz alleges in part under *Franks v. Delaware*, 438 U.S. 154 (1978) that probable cause did not support the arrest warrant because Defendant Gonterman's warrant affidavit contained material misstatements and omissions. Plaintiff Cruz specifically contends that Defendant Gonterman: (1) failed to conduct a competent pre-arrest investigation; (2) relied on coerced false statements from Drew Dugger and Nicholas Glenn and a tip from Mariah Madrid about a Facebook post, though Ms. Madrid had no firsthand knowledge of the incident; and (3) withheld material facts from the assistant district attorney and the judge.

### 1. Failure to Conduct a "Minimally Competent Investigation"

Plaintiff Cruz first contends that Defendant Gonterman's investigation of Jaydon Chavez-Silver's murder "failed even the most basic tests for a minimally competent police investigation" necessary to develop probable cause that Plaintiffs killed Jaydon by shooting into the Nakomis house. (Doc. 41 at 50). Specifically, Plaintiff Cruz argues that: Defendant Gonterman failed to interview Allen Moya, a third individual who commented on the Facebook posts the night Jaydon was killed; failed to interview Plaintiffs' alibi witnesses; failed to interview Nicholas Gonzales' alleged alibi witness; failed to interview Armand VanDyke to verify information Nicholas Glenn

shared regarding VanDyke's conversation with Plaintiff Maez; failed to corroborate Devin Griego's alleged alibi; failed to investigate an alleged "shots fired" incident at the Western Skies party; and failed to investigate Plaintiffs' alibi and verify their locations at the time of Jaydon's shooting through cellphone records or cell phone tower data. Plaintiffs also maintain that Defendant Gonterman failed to properly investigate Nicholas Gonzales' possible involvement in Jaydon's murder, including the facts surrounding Gonzales' arrest in Rio Rancho.[10]

Perhaps Defendant Gonterman could have done more, "[b]ut for purposes of qualified immunity, [Defendants] needed merely to show arguable probable cause to satisfy the Fourth Amendment's reasonableness requirement." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kansas,* 864 F.3d 1154, 1178 (10th Cir. 2017); *see also Stonecipher,* 759 F.3d at 1141 ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."). And "[t]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth." *Beard,* 24 F.3d at 116 (internal quotation marks and citation omitted). "To the contrary, it is generally considered to betoken negligence *at most*." *Id*. (emphasis in original). The probable cause standard also does not require officers to correctly resolve conflicting evidence or to make accurate credibility determinations. *See Wright v. City of Philadelphia,* 409 F.3d 595, 603 (3d Cir.2005) ("The officers did not believe Wright's explanation for her entry [into the residence]. Although they may have made a mistake, their belief was not unreasonable in light of the information the officers possessed at the time."). Moreover, "once probable cause is established,

---

[10] The Court is somewhat perplexed by this allegation given that it appears Nicholas Gonzales was indicted for Jaydon Chavez-Silver's murder on the same day Plaintiffs were indicted and through the same grand jury testimony that applied to Plaintiffs.

an officer is not required to continue to investigate exculpatory evidence before arresting a suspect." *Cortez v. McCauley,* 478 F.3d 1108, 1121 n. 18 (10th Cir. 2007) (en banc).

In *Romero v. Fay*, the Tenth Circuit rejected the plaintiff's contention that the officer's failure to contact the plaintiff's alleged alibi witnesses amounted to a constitutional violation that rendered the arrest without probable cause. 45 F.3d 1472, 1477 (10th Cir. 1995). The court reviewed the cases the plaintiff cited and determined that they did not support the "broad proposition that a police officer who interviews witnesses and concludes probable cause exists to arrest violates the Fourth Amendment by failing to investigate the defendant's alleged alibi witnesses." *Id.* Rather, "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime had been committed at all" before conducting an arrest. *Id.* at 1476-77. The *Romero* plaintiff did not contend that the officers failed to investigate fundamental evidence at the crime scene, nor did the plaintiff argue that the officers acted unreasonably based on the information known to them at the time of the arrest. *Id.* Ultimately the court held that the plaintiff failed to meet his burden of showing that the officers arrested him without probable cause. *Id.* at 1477-78.

Here, Defendant Gonterman and other officers interviewed witnesses who were at the Nakomis party at the time Jaydon was shot as well as area residents who might have heard or seen anything related to the shooting. Defendant Gonterman followed up on a tip regarding Christopher Cruz's Facebook post by interviewing some of the individuals who commented on the post. She applied for and was granted a search warrant of Bernie Miller's phone to corroborate potential motive information she received. And, putting aside concerns of coercion addressed below, Defendant Gonterman interviewed other individuals – including Nicholas Glenn and Drew Dugger

- whose names came up or who were otherwise involved with the same group that had been hanging out at the Nakomis residence at the time Jaydon was shot and also a month prior when a fight had broken out. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Defendant Gonterman's investigation, though certainly not without flaws, meets the minimum Fourth Amendment requirements.

Even if the reasonableness of Defendant Gonterman's investigation was constitutionally infirm, she would be entitled to qualified immunity on the second prong of the analysis. The cases Plaintiffs cite do not clearly establish a duty to investigate all potential alibi witnesses, to analyze cell phone data to determine a suspect's location, or to resolve conflicting information. Rather, the clearly established law required Defendant Gonterman to investigate basic evidence and interview witnesses readily available at the scene. Plaintiffs have failed to cite a case establishing that a less than complete investigation amounts to reckless disregard for the truth.

### 2. Inclusion of False Coerced Statements in the Warrant Affidavit

Plaintiff Cruz also alleges that Defendant Gonterman included false information in the arrest warrant affidavit. Specifically, Plaintiff alleges that Defendant Gonterman coerced Glenn and Dugger through improper interrogation tactics to make false statements against Plaintiffs. Plaintiff Cruz contends that Gonterman then included these coerced statements in the warrant affidavit and criminal complaint leading to the arrests of both Plaintiffs. Plaintiff Cruz maintains that, absent the improperly coerced testimony, Defendants lacked probable cause to arrest him. In a Section 1983 action, the burden is on the plaintiff to show that a witness's statement "did not constitute reasonably trustworthy information sufficient to lead a prudent police officer to conclude that Plaintiff[s] murdered [Jaydon Chavez-Silver]." *Romero,* 45 F.3d at 1478.

At the outset, the Court addresses Defendants' argument that Plaintiffs lack standing to

"assert alleged constitutional violations on behalf" of third parties. (Doc. 29 at 20-21). In response, Plaintiffs cite to *Clanton v. Cooper*, where the Tenth Circuit held that a government actor violated the plaintiff's clearly established due process rights under the Fourteenth Amendment by obtaining a third party's involuntary confession and then using that involuntary confession to arrest and imprison the plaintiff. 129 F.3d 1147, 1157-58 (10th Cir. 1997) (stating that "because [such] evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person"). Defendants argue that *Clanton* was abrogated by *Estate of Papadakos v. Norton* and is therefore inapplicable here. In *Estate of Papadakos,* the Tenth Circuit held that the defendant had no substantive due process rights under the Fourteenth Amendment to remain free from being arrested for a crime based on the allegedly coerced statements of a third party. 663 F. App'x 651, 658 (10th Cir. 2016). The court reached its decision in light of the Supreme Court's holding in *Albright v. Oliver*, 510 U.S. 266 (1994) as applied by the Tenth Circuit in *Becker v. Kroll*, 494 F.3d 904, 917-19 (10th Cir. 2007) in which the Tenth Circuit concluded that "the unavoidable construction of *Albright* is that no § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment." Those cases recognized instead that "the Fourth Amendment govern[s] pretrial deprivations of liberty." *Taylor v. Meacham,* 82 F.3d 1556, 1560 (10th Cir. 1996).

Plaintiffs do not bring a substantive due process claim. Rather, Plaintiffs' challenge here arises under the Fourth Amendment. It is true that Plaintiffs cannot assert a Fourth Amendment claim on behalf of third parties. *See Alderman v. United States,* 394 U.S. 165, 174 (1969) ("We adhere…to the general rule that Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted."). However, the Court agrees with

Plaintiffs that they have standing to vindicate their *own* constitutional rights based on allegedly coerced false statements of third parties implicating them in Jaydon Chavez-Silver's murder to the extent that these statements would vitiate probable cause if excluded under *Franks*. *See, e.g., Hurt v. Wise,* 880 F.3d 831, 842 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago,* 914 F.3d 472 (7th Cir. 2019) (noting that the defendants argued plaintiffs did not have standing to challenge the reliability of a third-party's confession, but stating that neither plaintiff "is asserting a constitutional right on [the third-party's] behalf when each argues that [the third-party's] interrogation did not give the police reliable evidence that she was involved" in the death. Rather, "[e]ach makes the straightforward assertion that the police used flimsy information to arrest *her*"); *Wilkins v. DeReyes,* 528 F.3d 790 (10th Cir. 2008) (in the context of a Section 1983 suit for malicious prosecution, addressing the defendant's challenges to the voluntariness of two witness statements that officers used to establish probable cause for his arrest). The Court finds that Plaintiffs have standing to challenge the voluntariness of Glenn and Dugger's statements because those statements were used by Defendant Gonterman to establish probable cause for Plaintiffs' arrests.

The Court looks at the totality of the circumstances when assessing whether a witness's statements are voluntary. *United States v. Dowell,* 430 F.3d 1100, 1107 (10th Cir. 2005). Factors to consider include "the [witness's] age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of interrogation, and the conduct of the police officers." *Id.* (alteration in original)*; see also Wilkins v. DeReyes,* 528 F.3d 790, 799-800 (10th Cir. 2008) (on summary judgment the district court considered the two witnesses' respective ages, lack of education, circumstances of the interviews and threats combined with promises of

leniency and safety in determining that the interviews in which the witnesses inculpated the plaintiff were coercive).

Additionally, "[i]n order to establish that [a witness's] admission was coerced or involuntary as a matter of law, [Plaintiffs] must show that [the witness] was subject to threats of illegitimate action." *United States v. Tafoya*, 459 F.2d 424, 427 (10th Cir. 1972). For example, threats of harm to the individual being questioned or to his family and promises of leniency or protection from harm in return for a statement constitute improper coercion. *See Griffin v. Strong,* 983 F.2d 1540, 1543 (10th Cir. 1993) (finding a statement involuntary where the defendant promised plaintiff lesser punishment, indicated that plaintiff would not be able to see his daughter, and promised to protect plaintiff in order to induce a statement). However, threats of realistic consequences or penalties the accused faces if untruthful do not constitute coercion. *See United States v. McNeal,* 862 F.3d 1057, 1064-65 (10th Cir. 2017) (discussing that admonishing an individual to tell the truth during a police interview by mentioning the potential realistic consequences of making false statements does not compel a finding of coercion and citing cases). Ultimately, "[a] statement is involuntary if the government's conduct cause[d] the [witness'] will to be overborne and his capacity for self-determination critically impaired." *United States v. Gonzalez,* 164 F.3d 1285, 1289 (10th Cir. 1999) (internal quotation marks and citation omitted) (alterations in original).

With these legal tenets as a backdrop, the Court reviews the evidence in the record, including transcripts and recordings of Defendant Gonterman's interviews with Nicholas Glenn and Drew Dugger, to determine whether Defendant Gonterman coerced Glenn and Dugger's statements and whether Defendant Gonterman should have known that her actions violated clearly established law.

*a. Interview with Nicholas Glenn*

At the time of Glenn's interview on August 11, 2015, he was eighteen years old, working, and living on his own in a rented house with some friends. *See* Pl. Ex. 3a, Tr. 31:3-22; 36:8-10. Defendant Gonterman and Detective Nix conducted Glenn's interview mid-day outside at a public park. *See* Pl. Ex. 3a; Pl. Ex. M1. Glenn's mother accompanied him to the interview and was present for the hour and one-half duration of the interview. After first introducing herself, Defendant Gonterman began the interview by stating to Glenn: "You're not in trouble. You're not a suspect. I'm really concerned for your safety. Okay? I know there's been threats made on your life, and I want to make sure you're safe. We're homicide detectives, so I don't want to have to tell your mom that you're dead – something happened to you. Okay?" Sometime after Glenn started recounting the conversation he had overheard between Maez and his friend Armand, the following exchange between Glenn and Defendant Gonterman ensued:

| | |
|---|---|
| Detective Gonterman: | So tell me about these threats that you've received. How did you receive those threats? |
| Nicholas Glenn: | What? I didn't receive any threats? |
| Detective Gonterman: | I thought you said you were sorting them out today. Or you learned about them today? |
| Nicholas Glenn: | Yeah, I learned about threats today – |
| Defendant Gonterman: | Okay. |
| Nicholas Glenn: | -- from my mom. She called – she called me worried. |

*See* Pl. Ex. 3a, Tr. 8:24-9:2.

Plaintiffs claim that Defendant Gonterman led Glenn to believe that there were threats against his life, and that she used this "interrogation tactic" to "further scare and manipulate" Glenn into giving a false statement about Donovan Maez. (Doc. 41 at 16, 20, 52-53).

The Court's examination of the audiotape and transcript of Glenn's interview, viewed in a light most favorable to the Plaintiffs, does not reveal evidence of coercion let alone evidence that Defendant Gonterman acted with deliberate or reckless intent when conducting the interview. The

only reasonable interpretation of the evidence is that there was miscommunication between Defendant Gonterman, Glenn's mother, and Glenn regarding whether there were specific threats on Glenn's life. Defendant Gonterman testified at her deposition that she arranged the meeting with Glenn through his mother. *See* Pl. Ex. 28, Tr. 76:3-5. Though Defendant Gonterman could not recall exactly what she told Glenn's mother at the time, she believed "it probably had to do something with the fact that, you know, the group of people that I'm investigating in this case are the same group of people in other homicides that my unit has investigated, and that, you know, if he's hanging around with these people and going to these parties, people are just shooting and it's likely that something could happen to him being at the wrong place at the wrong time." *See* Pl. Ex. 28, Tr. 76:9-34. Several times during the recorded interview Defendant Gonterman raised a general concern that the crowd she was investigating - and that Glenn was hanging out with - was capable of harm. *See, e.g.,* Pl. Ex. 3a, Tr. 34:20-24; 52:9-53:13. Glenn himself acknowledged the problems he could face if his name turned up as someone who had shared information with the police, at one point even describing everyone as "all gun happy." *See* Pl. Ex. 3a, Tr. 53:12-13; Tr. 34:17-19 ("Like I'd be fucked if my name – like they would straight pull out the guns right there, and start shooting. I know these guys. They're fucking crazy.").

Expressing a general legitimate concern for an individual's safety does not constitute coercion. Defendant Gonterman did not threaten punishment, make promises to Glenn in exchange for a statement, or otherwise subject Glenn to threats of illegitimate action. Moreover, nothing about Glenn's age, intelligence, or education suggests that he would be susceptible to police coercion. Nothing in the recording causes the Court to question Glenn's competence. The circumstances here do not reflect that Glenn's will was overborne and his capacity for self-determination critically impaired. The Court finds that under the totality of the circumstances

viewed in the light most favorable to the Plaintiffs, Glenn's statements inculpating Plaintiffs were not coerced.

  *b. Interview with Drew Dugger*

  The circumstances of Defendant Gonterman's interview with Drew Dugger differ from those of Glenn's interview. At the time of Dugger's interview on August 14, 2015, Dugger was a nineteen-year-old high school graduate, living with his mother, and working. *See* Def. Ex. N, Tr. 60:2-3; Def. Ex. N1 at 42:15-42:19. Unlike Glenn, Dugger was in custody at the Albuquerque Police Department on a warrant unrelated to this case. *See* Def. Ex. O, Warrant for Arrest; Def. Ex. N, Tr. 6:5-14. Because Dugger was in custody, Defendant Gonterman first advised him of his *Miranda* rights before conducting the approximately two-hour long interview. *See* Def. Ex. N1, Interview with Dugger Part I at 9:28-10:20. Dugger acknowledged that he understood his *Miranda* rights. *See id.* As with Glenn, Plaintiffs claim that Defendant Gonterman used coercive interrogation tactics to elicit an inculpatory statement about Plaintiffs from Dugger. Specifically, Plaintiffs maintain that although Dugger initially denied knowing anything about Plaintiffs' alleged involvement in Jaydon's murder, Dugger's story developed over time in response to Defendant Gonterman's anger and threats to arrest him.

  Throughout most of the interview, Defendant Gonterman's tone with Dugger is relatively calm. She never shouts, stands over Dugger, or otherwise gets in his physical space. There are certainly instances where Defendant Gonterman becomes stern with Dugger. For example, after acknowledging that Dugger and Donovan Maez "are tight" and that Dugger had covered for Maez in the past, Defendant Gonterman warned Dugger that if he did not share what he knew she would finish the interview and book Dugger into jail. *See* Def. Ex. N1 at 18:17-20:42. She continued: "You're not making me mad…I'm just saying I'm not going to play games, and I'm not going to

waste any time. And I'm not going to be lied to. Okay?...And I'm not screwing around when it comes to kids getting killed. Okay?" *See* Def. Ex. N1 at 18:17-20:42; Pl. Ex. 4, Tr. 21:1-19.

Additionally, the following dialogue ensued between Dugger and Defendant Gonterman later in the interview:

| Det. Gonterman: | You forget that we've talked before. Okay? |
| Drew Dugger: | No, I know, I know. |
| Det. Gonterman: | Listen. Look at me. I'm not messing around today. I'm not going to let you lie to me. I'm not going to have it. Because I will just – you know, we'll just end this and you can go to jail. |
| Drew Dugger: | I'm really (inaudible). |
| Det. Gonterman: | You keep giving me little more bits and pieces, when we could just get to it and tell me everything you know. Because I know this— you're full of shit. You're – you're giving me little bits and pieces, but that's not what Donovan told you, because you guys are tight. And he's told other people a way lot more, so I know you're covering for him. |
| Drew Dugger: | No. |
| Det. Gonterman: | You didn't want to give his name up before with the dope— |
| Drew Dugger: | I'm going to say—I'm going to say fuck him. |
| Det. Gonterman: | Listen to me. Yeah, you say, "Fuck him," but you don't. Okay? You cover for his ass all the time. You didn't want to give his name the last time. I know you better than yourself. Okay? So we're done playing this game. I'm done being – you know, I'm going to sit here and be nice, or whatever. This is—you know what? I talk to Jaydon's mom every day, and she cries to me, "Please solve this case. Please give me closure." It sucks, Drew. He was a good kid and he didn't deserve it. |
| Drew Dugger: | Believe me, I know. |
| Det. Gonterman: | So you need to, you know, help that family get some closure because you know, and you need to say, "Today's going to be the day I'm going to work with the police. I'm going to work with Jodi, and I'm going to tell the truth, everything I know." And you need to change your life and stop hanging out with these kids or you're going to end up dead yourself. |
| Drew Dugger: | That's what I'm working on. That's what I (inaudible) to do. |

*See* Def. Ex. N, Tr. 27:21-29:15.

Plaintiffs argue that the tactics Defendant Gonterman employed during Dugger's (and Glenn's) interview were akin to those incurred by the two witnesses in *Wilkins v. DeReyes,* 528

F.3d 790 (10th Cir. 2008). In *Wilkins,* the two plaintiffs were arrested and prosecuted based on coerced false statements made by two fellow gang members. 528 F.3d at 793. The district court found that the evidence implied that the officer "wanted to pin the murders on [the plaintiff] and the only way for [the gang member] to help himself was to say that [the plaintiff] was involved." *Id.* at 800. The district court also found that the second gang member's statements were similarly coerced by "egregious…promises of help and safety, as well as the threats of harm…" *Id.* Finally, the district court found that a question of fact existed as to whether the officers acted recklessly or intentionally when coercing the false statements and denied the officers' request for qualified immunity. *Id.* at 799-801. The Tenth Circuit affirmed, noting that "[i]n the affidavits supporting warrants to arrest [the two plaintiffs], the officer relied entirely on the allegedly coerced false statements" to establish probable cause. *Id.* at 801.

Plaintiffs principally contend that Dugger was coerced into giving a false statement inculpating Plaintiffs by Defendant Gonterman's threats to book him into jail if he lied to her. While the threat of jail is a factor the Court certainly considers in the totality-of-the-circumstances analysis, it is not inappropriate or coercive for officers to inform a person of the legitimate consequences of taking a particular action. *Cf. McNeal,* 862 F.3d at 1064 (noting that "[i]n order to establish that [defendant's] admission was coerced or involuntary as a matter of law, defendant must show that he was subject to threats of illegitimate action" and subsequently rejecting the defendant's claim that her confession was coerced because she did not challenge the proposition that she would indeed be subject to prosecution for a felony offense if she lied to officers). More than once throughout the interview Defendant Gonterman reminded Dugger that he had previously covered for Maez and warned Dugger that if he did not tell her the truth, she would end the conversation and take him to jail. However, as in *McNeal,* Defendant Gonterman's concern was

not silence but falsehood. Defendant Gonterman's warning that she could book Dugger rather than continue with an interview in which he was just going to lie, stated in a noncoercive manner, was not a threat of illegitimate action rendering Dugger's statement involuntary. It is undisputed that Dugger was in custody on an outstanding warrant for a crime for which officers could have booked him.

Moreover, Dugger was a high school graduate, maintained a job, and was not impaired. Dugger told Detective Nix that he had PTSD from having been beat up by his father and by seeing others get shot. *See* Def. Ex. N, Tr. 159:4-11. However, the Court reviewed the video recording and transcript of Dugger's interview, and there is no evidence that Dugger was incompetent. To the contrary, Dugger responded competently, appropriately, and intelligently to the questions he was asked. Although there are moments where Defendant Gonterman is firm with Dugger, as recounted above, it is evident that the two know and are familiar with one another. At points the two even gossip about certain individuals they both know and laugh. The circumstances in *Wilkins* which led to the district court's determination that the two gang members' statements were coerced were indeed egregious, but they are vastly different from those presented here. The Court finds that, under the totality of the circumstances, Dugger's statements were voluntary. Accordingly, Defendant Gonterman could reasonably rely on Glenn's and Dugger's respective statements to establish probable cause to arrest Plaintiffs for Jaydon Chavez-Silver's murder.

### 3. Omission of Material Facts from the Warrant Affidavit

"In a case involving information omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir. 1996) (internal quotations omitted). In certain cases,

"[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (internal quotations omitted). But "[a]llegations of negligence or innocent mistake are insufficient." *Franks,* 438 U.S. at 171. And "*Franks* does not extend to immaterial omissions." *Stewart v. Donges,* 915 F.2d 572, 581 (10th Cir. 1990).

The Court begins with the second prong of the qualified immunity analysis and finds that it is a clearly established violation of an individual's Fourth Amendment rights for officers to knowingly or recklessly omit from an affidavit information that would negate probable cause. *Stewart,* 915 F.2d at 582-83; *see also Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004) ("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest."). Because Plaintiffs have met their burden to show that the constitutional right was clearly established at the time of the alleged violation, the Court turns to whether Defendant Gonterman violated Plaintiffs' Fourth Amendment rights. This requires assessing (1) whether the omitted information was material and (2) whether the information was omitted knowingly or recklessly. In analyzing whether omissions were material, the Court must insert the omitted truths and then examine the affidavit to determine whether it supports a finding of probable cause. *Stewart*, 915 F.2d at 582 n.13.

    a. *Material Omissions from the Affidavit*

Plaintiffs primarily claim that Defendant Gonterman omitted the following material facts from the warrant affidavit that would have vitiated probable cause if they had been included: (1) that Mariah Madrid lacked firsthand knowledge of the shooting and did not personally know Plaintiffs (Doc. 41 at 29-30); (2) William Pagan and Devin Griego's statements about the

Facebook posts (Doc. 41 at 28); (3) that Defendant Gonterman failed to interview Allen Moya about the Facebook posts (*Id.*); (4) that Glenn and Dugger's statements were coerced (Doc. 41 at 29); (5) that Detective Gonterman failed to interview Armand Van Dyke who would have clarified the conversation Glenn overheard between Van Dyke and Plaintiff Maez (Doc. 41 at 28-29); (6) that there were conflicting theories about the motive for the shooting (Doc. 41 at 30); (7) that Defendant Gonterman failed to interview any of Plaintiffs' potential alibi witnesses (Doc. 41 at 29-30) and; (8) information about Nicholas Gonzales as an alternative suspect in Jaydon's murder (Doc. 41 at 30). After reviewing the record, the Court concludes that none of the alleged omissions were material because their inclusion in the affidavit would not have negated probable cause that Plaintiffs were involved in Jaydon Chavez-Silver's murder.

The majority of the cases where the Tenth Circuit has denied qualified immunity based on material omissions from a warrant affidavit are those in which the omission undermines the primary or sole basis for probable cause. *See, e.g. Stewart,* 915 F.2d at 583 ("[W]e can conceive of few omissions which would be more material than the failure to disclose that the main complainant had recanted his testimony and confessed it was a fabrication."); *Bruning v. Pixler,* 949 F.2d 352, 359 (10th Cir. 1991) ("[T]he omissions here directly undermine Victim #1's alleged identification of Plaintiff as her assailant. That identification was virtually the only evidence linking Plaintiff to either of the assaults, and without it, there would be no probable cause to believe Plaintiff was the assailant."); *Robitaille v. Spitzer,* 175 F. Supp. 1299, 1306 (D. Colo. 2016) ("Because the inclusion of such information would invalidate the *only* assertion to support probable cause included in the affidavit – the implication that Dale Sisneros had identified Penny and Duane as the suspects – the omissions are material." (emphasis original)).

To begin with, several of the statements Plaintiffs claim should have been included in the

warrant affidavit relate to Plaintiffs' argument that Defendant Gonterman failed to conduct a competent pre-arrest investigation. The Court has already discussed that there is no clearly established law that required Defendant Gonterman to interview all potential witnesses and follow all potential leads as part of her investigation. *See Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir. 1995) ("Plaintiff contends that…under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree."); *see also*, *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1257 n.8 (10th Cir. 1998) (noting that "an officer may not ignore a video tape which records the alleged criminal acts" but in general "officers are not required to conduct full investigations before making an arrest"). Consequently, the Court will not address in its analysis here the alleged omission of any speculative statements Allen Moya, Armand Van Dyke, and Plaintiffs' potential alibi witnesses might have made in July or August 2015.

The probable cause standard also does not require officers to correctly resolve conflicting evidence. *See Wright,* 409 F.3d at 603; *see also Woods v. Nuemeyer,* 77 F.3d 494 (10th Cir. 1996) (noting that probable cause "does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports belief in guilt" (internal quotation marks and citation omitted)). For example, Defendant Gonterman mentions two possible distinct motives for the shooting in her affidavit but she was not required to resolve this disparity in order to establish probable cause. Finally, the Court has determined that Glenn and Dugger's statements implicating Plaintiffs in Jaydon's murder were uncoerced. The Court will consider each remaining alleged omission separately.

_Mariah Madrid Did Not Have Firsthand Knowledge or Know Plaintiffs_

Plaintiffs maintain that the facts that Mariah Madrid lacked firsthand knowledge of the events surrounding Jaydon's death and did not personally know either Plaintiff were material omissions from the affidavit.[11] (Doc. 41 at 20). Madrid's role was a limited one. She is the person who first alerted Defendant Gonterman to the Facebook posts that Defendant Gonterman later included in the arrest warrant affidavit for Plaintiff Cruz. In the affidavit, Defendant Gonterman wrote that she received three tips implicating Donovan Maez in Jaydon's murder. (Doc. 29-4). Defendant Gonterman clarified in her deposition that Mariah Madrid was one of the three tipsters she was referring to. _See_ Pl. Ex. 28 at 81:6-19. Plaintiffs appear to contend that, absent additional information about Madrid, the suggestion that Defendant Gonterman received _three_ tips implicating Donovan Maez is misleading. The Court agrees that the affidavit would have benefited from a more robust discussion about the role of the third tipster, including information that the third tip was solely about the Facebook posts and that the Facebook tipster did not know Plaintiffs personally and did not have direct information that either Plaintiff was involved in the shooting. Nevertheless, the alleged omissions pertaining to Mariah Madrid would not vitiate probable cause to arrest Plaintiffs even if they had been included in the affidavit. Their inclusion would not have vitiated probable cause because of the information in the Facebook posts themselves, statements from Glenn and Dugger, possible motive information, an indication that Cruz drove a light-colored Nissan, and associational information in the affidavit establishing probable cause.

---

[11] Defendants suggest that information about whether Mariah Madrid personally knew Plaintiffs was not within Defendant Gonterman's knowledge at the time of Plaintiffs' arrests, referencing Plaintiffs' citations to an interview with Madrid on August 19, 2015. _See_ Doc. 47 at 3; Def. Ex. BB, Interview with Madrid. However, Plaintiffs also cite to Defendant Gonterman's deposition in which she indicated that she believed Madrid had told her on the phone prior to the August 19, 2015 interview that she did not know Plaintiffs. _See_ Pl. Ex. 28, 87:23-88:4.

*Statements from Devin Griego and William Pagan about the Facebook Post*

Defendant Gonterman interviewed Devin Griego and William Pagan regarding the Facebook messages that Plaintiff Cruz posted in the hours surrounding the shooting at 1101 Nakomis. Plaintiffs claim that Defendant Gonterman failed to disclose that Devin Griego and William Pagan each informed her that the Facebook post included in the affidavit was not about Jaydon's murder. In the affidavit, Defendant Gonterman recounts the Facebook post from "Chriis Marley" and later states that "[t]he social media messages are consistent with the timeframe of the shooting, people involved and associates and indicate to me based on my training and experience that they are discreetly talking about the shooting and no one giving anyone up."

Plaintiffs mischaracterize statements from Griego and Pagan as affirmations that the quoted Facebook post was not about Jaydon's murder. When asked to clarify the post, Pagan responded in part: "So when you hear stuff like that, they're talking about whatever, whatever they're talking about, I don't even know what they're talking about. They're probably talking about getting into some type of trouble, but they're not shooting nobody, getting into some type of trouble, and whatever trouble they're getting into…" *See* Pl. Ex. 8 at 311. Griego's statement regarding the meaning of the Facebook post is equally inconclusive. Defendant Gonterman read the Facebook post and comments to Griego, informing him that she interpreted those messages to be about Jaydon's shooting and retaliation from the fight a month prior. *See* Def. Ex. CC at 37:9-16. Griego responded: "That's a whole different thing probably, like honestly. I mean, you can try to say it's related to that but it's not." Defendant Gonterman next asked Griego to then explain what the post was related to and he responded, "I don't know. If you see the whole thing, so the top of the posts, let me see what it posts about." *See* Def. Ex. CC at 37:17-25. Griego never expounds on his understanding of the posts during the remainder of the interview. *See generally* Def. Ex. CC1,

Audio Recording of Griego Interview.

The Court concludes that statements Devin Griego and William Pagan made to Defendant Gonterman about the meaning of the Facebook posts are not material. Their statements are nebulous at best with regards to illuminating the significance of the post and comments. Inclusion of their statements in the affidavit would not undermine Defendant Gonterman's primary basis for probable cause. Furthermore, Defendant Gonterman was allowed to draw inferences about the Facebook post based on her own training and experience. *See Ornelas v. U.S.,* 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists."); *see also United States v. Wicks,* 995 F.2d 964, 972-73 (10th Cir. 1993) (same); *United States v. Hoyos,* 892 F.2d 1387, 1392 (9th Cir. 1989) ("[t]he experience and expertise of the officers involved in the investigation and arrest may be considered in determining probable cause").

## *Nicholas Gonzales as an Alternative Suspect*

Finally, Plaintiffs contend that "one of the most striking omissions" from the affidavit that, if included, would have vitiated probable cause was information about Nicholas Gonzales, an additional suspect. (Doc. 41 at 9). However, establishing probable cause as to one suspect does not require exclusion of probable cause regarding other suspects. *See, e.g. Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 11 (1st Cir. 2004) ("Probable cause determinations are, virtually by definition, preliminary and tentative…we [ ] have disclaimed any unflagging duty on the part of law enforcement officers to investigate fully before making a probable cause determination.") (internal citations omitted); *United States v. Moody,* 762 F. Supp. 1491, 1500 (N.D. Ga. 1991) (rejecting argument by defendant that inclusion of information about investigation of alternative suspect in affidavit supporting search warrant would have defeated probable cause with respect to

defendant); *cf. Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding that the requirement that a search or seizure of a person be supported by probable cause "particularized with respect to that person" could not be "undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another [person]); *Diab v. McDermitt*, Case No. 14-cv-0764 LH/LAM, 2016 WL 10587965 (D. N.M. Feb. 19, 2016) (unpublished) (finding that the defendant officer "conducted a proper inquiry and had ample support for the statements she made in her arrest warrant affidavit, regardless of whether there might have been another suspect").

For example, in *United States v. Moody*, the defendant moved to suppress information obtained by a search warrant, contending that by failing to disclose evidence implicating another suspect agents had recklessly omitted material information from the warrant affidavit. 762 F. Supp. at 1500. The court concluded the defendant failed to demonstrate that the omitted information pertaining to the alternative suspect would have defeated probable cause if included in the affidavit. *Id.* The court explained:

> To satisfy the fourth amendment's probable cause requirement, the government need not demonstrate that a person is the *chief* suspect in a criminal investigation. Indeed, implicit within the concept of probable cause is the notion that the government may pursue multiple, perhaps even divergent lines of investigation so long as the government establishes probable cause as to each prior to the issuance of any warrant.

*Id.* (emphasis in original). Similarly here, the Court finds that the evidence Defendant Gonterman gathered against Nicholas Gonzales would not have detracted from the probable cause showing as to Plaintiffs and failure to include information about Gonzales is not a *Franks* violation.

b. *Knowing or Reckless Disregard for the Truth*

Even if the Court had concluded that the alleged omissions, either individually or together, were material and undermined probable cause, that does not end Plaintiffs' burden. Plaintiffs were obliged to but have not "ma[de] a substantial showing of deliberate falsehood or reckless disregard

for the truth" by Defendant Gonterman. *Stonecipher,* 759 F. 3d at 1142. To establish reckless disregard in the presentation of information to a judge, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations… and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard,* 24 F. 3d at 116; *see also Wilson v. Russo,* 212 F.3d 781, 787-88 (3d Cir. 2000) (holding that "omissions are made with reckless disregard if an officer withholds facts in his ken that any reasonable person would have known…was the kind of thing the judge would wish to know"). "Recklessness may [also] be inferred from omission of facts which are 'clearly critical' to a finding of probable cause." *DeLoach*, 922 F.2d at 622. Plaintiffs have presented no evidence suggesting Defendant Gonterman omitted any facts from the affidavit knowingly or with reckless disregard for the truth rather than out of negligence or inadvertence. Moreover, as discussed above, the facts Plaintiffs claim Defendant Gonterman omitted from her affidavit are not "clearly critical" to the finding of probable cause. Plaintiffs do not challenge probable cause on the face of the warrant affidavit, and the Court finds that there were no material omissions from or false information contained in the affidavit that would have defeated probable cause. Accordingly, the Court concludes that Defendant Gonterman did not violate the Fourth Amendment when she presented the arrest warrant affidavit to an assistant district attorney and then to a judge, resulting in the issuance of an arrest warrant for Plaintiff Cruz. Defendant Gonterman is entitled to qualified immunity as to Plaintiff Cruz's Count I claim.

## II.     Defendants' Motion for Summary Judgment on Plaintiffs' Section 1983 Claim for Malicious Prosecution (Count II)

The Tenth Circuit "has recognized the viability of a malicious prosecution claim under § 1983." *Taylor,* 82 F.3d at 1560. Unlike a false arrest claim, malicious prosecution concerns detention only "[a]fter the institution of legal process." *Wilkins*, 528 F.3d at 798. "A malicious

prosecution claim under § 1983 is premised on the theory that the defendant initiated or continued a proceeding against the plaintiff without probable cause." *Schoenfeld v. Thompson,* Case No. 16-cv-02630-MSK, 2017 WL 8944003, *5 (D. Colo. June 7, 2017). Plaintiffs' respective arrests aside, the Court understands Plaintiffs' Section 1983 claim for malicious prosecution against Defendant Gonterman to relate to post-arrest events and her alleged failure to provide information to the district attorney's office that Plaintiffs maintain would have dissipated probable cause for Plaintiffs' continued incarceration and prosecution. (Doc. 41 at 57-60).

To prevail on a Section 1983 malicious prosecution claim, a plaintiff must establish that "(1) the defendant[s] caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant[s] acted with malice; and (5) the plaintiff sustained damages." *Wilkins*, 528 F.3d at 799. Regarding the first element, "an officer typically does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing the charge and the court in issuing an indictment or warrant constitute superseding causes that break the chain of causation." *See Calvert v. Ediger*, 415 F. App'x. 80, 83 (10th Cir. 2011) (citing *Taylor*, 82 F.3d at 1564). However, officers are not shielded from liability for "malicious prosecution if they conceal or misrepresent material facts to the prosecutor, whose judgment was thereby influenced by the misstatements." *Id.* (citing *Pierce*, 359 F.3d at 1292-93).

In arguing for dismissal of this malicious prosecution claim, Defendants primarily focus on the favorable termination factor. Plaintiffs bear the burden of showing that termination was favorable. *See Cordova v. City of Albuquerque,* 816 F.3d 645, 650 (10th Cir. 2016). Defendants claim that Plaintiffs cannot satisfy the favorable termination element because the respective dismissals for each plaintiff were without prejudice and state that there is "insufficient evidence to

proceed *at this time*" against Plaintiffs – language Defendants claim is indicative of the State's intent to proceed against Plaintiffs in the future rather than indicative of innocence. (Mot. at 13-14 (emphasis original)). Generally, in deciding whether a *nolle prosequi* constitutes favorable termination, a court must "look to the stated reasons for the dismissal as well as to the circumstances surrounding it in an attempt to determine whether the dismissal indicates the accused's innocence." *Wilkins,* 528 F.3d at 803. "The dispositive inquiry is whether the failure to proceed implies a lack of reasonable grounds for the prosecution." *Id.* (internal quotation marks and citation omitted).

Defendants' argument that there was no favorable termination in the cases against Plaintiffs, based largely on the temporal language in the *nolle proseques*, must fail. Plaintiffs correctly point out that in *Wilkins v. DeReyes* the Tenth Circuit determined that the *nolle proseques* in that case should be considered terminations in favor of the plaintiffs because "[t]he dismissals were not entered due to any compromise or plea for mercy[,]" but resulted from the prosecutor's judgment that the case could not be proven beyond a reasonable doubt." 528 F.3d at 803. The language of the *nolle proseques* at issue in *Wilkins* is similar to the *nolle proseques* at issue here. *See id.* (quoting the language of the *nolle prosequi*: "[I]t is the State's opinion that currently there is insufficient evidence upon which to retry the defendant[s] for these crimes.")). The dismissals at issue in this case, as in *Wilkins*, clearly state that they were the result of insufficient evidence for the prosecutor to proceed. In other words, the prosecutor made a judgment that the case could not be proven beyond a reasonable doubt. Moreover, Plaintiffs submitted deposition testimony from Penny Gilbert, the lead prosecutor in the Jaydon Chavez-Silver case. Ms. Gilbert testified that she filed the *nolle proseques* after obtaining information that Plaintiffs were not present in the vehicle the night Jaydon Chavez-Silver was shot. *See* Pl. Ex. 31, Penny Gilbert Depo., at 11:17-

25. At the time of her deposition in January 2018, Ms. Gilbert had not learned any additional facts to establish probable cause to refile charges against either plaintiff. *See* Pl. Ex. 31, Penny Gilbert Depo., at 14:21-15:21. This meets the Tenth Circuit's "indicative-of-innocence" standard and the Court finds that the respective actions against Plaintiffs terminated in their favor.

However, Plaintiffs' malicious prosecution claim fails on other grounds. Under *Pearson v. Callahan,* the Court is no longer bound to a rigid sequential framework for determining whether qualified immunity applies. 555 U.S. 223, 242 (2009). Rather, the Court can choose which of the two prongs, the constitutional violation prong or the clearly established right prong, to address first based on the circumstances of a particular case. *Id.* Plaintiffs have not cited a Supreme Court or Tenth Circuit decision specifically holding that, if an officer receives information in post-arrest proceedings that may be material to probable cause, the officer violates an individual's Fourth Amendment rights if the officer merely gives the prosecutor the entire case file rather than identifying specific pieces of information for the prosecutor.

The U.S. Supreme Court recently reiterated that "clearly established law should not be defined at a high level of generality" and that "the clearly established law must be particularized to the facts of the case." *White v. Pauly,* __ U.S. ___ , 137 S. Ct. 548, 552 (2017) (per curiam) (citations and internal quotation marks omitted); *see also District of Columbia v. Wesby,* ___ U.S. ____ , 138 S.Ct. 577, 590 (2018) ("The clearly established standard…requires a high degree of specificity." (quotations omitted)). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in light of pre-existing law the unlawfulness must be apparent." *White,* 137 S.Ct. at 552 (citations and quotations omitted).

In their Response brief, Plaintiffs cite to Tenth Circuit cases and a Seventh Circuit case that establish an officer may not ignore facts that dissipate probable cause. *See Harte,* 864 F.3d at 1182

(noting that "law-enforcement officers must not disregard facts tending to dissipate probable cause" during the course of a search and concluding that "what the deputies learned early on in the search [of plaintiff's home] dissipated probable cause to continue searching." (citations and internal quotation marks omitted)); *Pierce,* 359 F.3d at 1296 ("when the fabrication of evidence results in a constitutional deprivation, the official's responsibility for that deprivation does not hinge on the exact stage of investigatory or prosecutorial process at which the fabrication occurred"); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of an even lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

The circumstances in *Harte* and *BeVier* are markedly different from and more egregious than those here. In *Harte,* officers obtained information that dissipated already shaky probable cause to search the premises while in the midst of the search but ignored the evidence and continued searching while the plaintiffs were held under armed guard on the family's couch. *Harte,* 864 F.3d at 1160, 1182, 1183. The case did not involve a Section 1983 claim for malicious prosecution. In *BeVier,* an officer promptly arrested the plaintiff parents for child neglect upon seeing two sunburnt, filthy, and listless children, one with a diaper rash, sitting in the sun. 806 F.2d at 125. The officer never questioned the teenager who was watching the children at the time. *Id.* An element of the crime required evidence that the parents knew of the children's condition but failed to prevent it. *Id.* at 126. The officer did not interview the parents first and thus had no information about their intent. *Id.* at 127-28. Accordingly, there was not even probable cause to believe that a crime had existed at the time of arrest. *Id.* The *BeVier* court explained that "[r]easonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." 806 F.2d at 128. In this case, it is undisputed that someone

shot into the Nakomis residence killing Jaydon Chavez-Silver and that Defendant Gonterman conducted a pre-arrest investigation, regardless of Plaintiffs' disagreement as to its quality.

Finally, in *Pierce* the plaintiff brought a Section 1983 claim against a police department forensic chemist after spending fifteen years in state prison for a rape he did not commit. 359 F.3d at 1281. The Tenth Circuit ruled that the fact officers had probable cause for the initial arrest did not preclude the chemist from potential liability for malicious prosecution if her alleged withholding of exculpatory evidence and fabrication of inculpatory evidence was the principal basis for charges being filed against plaintiff and the prosecutor's subsequent decision to proceed to trial. *Id.* at 1292. In denying qualified immunity to the chemist, the court stated:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision… *If police officers have been instrumental in a plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors, or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.*

*Id.* at 1292 (quoting *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir. 1988) (emphasis in original)). *Pierce*, more than the other cases Plaintiffs cited, expresses the general proposition that officers cannot withhold exculpatory information that would otherwise affect a prosecutor's decision to proceed with a case. However, Defendant Gonterman testified in her deposition that while she does not recall what she conveyed verbally to the district attorney, she believed she turned her whole case file over to the district attorney's office near arraignment. *See* Def. Ex. FF at 107:18-109:10. Plaintiffs deposed Assistant District Attorney Penny Gilbert who was the prosecutor assigned to the case and who presented the case to the grand jury. *See* Pl. Ex. 31, Gilbert Depo. Yet, Plaintiffs did not introduce any evidence disputing Defendant Gonterman's testimony that she provided her entire case file to the district attorney. At the hearing Plaintiffs suggested

that Defendant Gonterman was obligated post-arrest to do more than provide her case file to the prosecutor. They argued that she had an affirmative duty to draw the prosecutor's attention to specific pieces of information within the file.  While arguably this would be a better practice, the cases Plaintiffs cited do not constitute clearly established law that Defendant Gonterman had an obligation to do anything more than provide her case file containing the post-arrest information to the district attorney to allow the district attorney to make independent decisions about whether and how to proceed with prosecution.  The cases Plaintiffs cite are not factually similar enough to apply to Plaintiffs' claim.  Accordingly, Plaintiffs have not satisfied their burden under the clearly established law prong and the Court will not address the first prong of the qualified immunity analysis. The Court will grant Defendants summary judgment on Plaintiffs' malicious prosecution claim.

### III.    Defendants' Motion for Summary Judgment on Plaintiffs' Claims Under the New Mexico Tort Claims Act (Count III)

Plaintiffs also brought several claims against both Defendants arising under the New Mexico Tort Claims Act.  Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction." The Tenth Circuit has counseled that federal district courts "should decline the exercise of jurisdiction by dismissing the case without prejudice" where all federal claims have been dismissed before trial. *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010); *see also Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (internal quotation marks omitted). This is a removed case. (*See* Notice of Removal (Doc. 1)). The Notice of Removal indicated that the only basis for subject matter jurisdiction in the federal courts is 28 U.S.C. § 1331, federal question jurisdiction. (Doc. 1). The Court has granted summary judgment on and dismissed the federal claims. Because the remaining causes of action are predicated entirely on state law, the

Court concludes that remand of the state law claims is proper.  The Court will remand the claims under the New Mexico Tort Claims Act (Count III) to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

**CONCLUSION**

Plaintiffs have not demonstrated that Defendant Gonterman violated their clearly established constitutional rights.  Nor have they demonstrated that Defendant Gonterman knowingly or with reckless disregard for the truth included false statements or made material omissions in the arrest warrant affidavit for Plaintiff Cruz. Defendants' motion for summary judgment (Doc. 29) is granted as to Count I for illegal seizure and arrest and as to Count II for malicious prosecution under Section 1983. The Court will decline to exercise supplemental jurisdiction as to Count III and will remand Plaintiffs' state tort law claims in Count III to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

IT IS THERERFORE ORDERED THAT Defendant's Opposed Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint on Qualified Immunity and Other Grounds, and Memorandum in Support is GRANTED as to Counts I and II in Plaintiffs' Complaint, and the Court remands the case and Count III of the Amended Complaint to the Second Judicial District Court, Bernalillo County, State of New Mexico.

_____
SENIOR UNITED STATES DISTRICT JUDGE